(No. 28035.—

THE JOHN GABEL MANUFACTURING COMPANY, Appellant, *vs.* FRANCIS B. MURPHY, Director of Labor, Appellee.

*Opinion filed May 23, 1945—Rehearing denied September 13, 1945.*

456

Hugo J. Thal, of Chicago, for appellant.

George F. Barrett, Attorney General, (William C. Wines, of Chicago, of counsel,) for appellee.

Mr. JUSTICE STONE delivered the opinion of the court:

This is an appeal from a judgment of the circuit court of Cook county against appellant for an unpaid unemployment compensation assessment fixed by the Director of Labor. The sole question presented by the record is whether certain named persons, hereinafter referred to, were employees of appellant for the time here involved.

The facts are not in dispute. Appellant is and has been for a number of years engaged in the business of manufacturing automatic vending machines and automatic phonographs. Prior to October 1, 1938, it had placed automatic phonographs in stores and other locations for use by patrons. Prior to that date it employed Ohlson, Schennum, Becker, Severson, Engdahl and Blomberg to service its machines and collect the coins deposited therein. A young lady named Barran was employed to keep the books of those transactions. On October 1, 1938, appellant leased all the machines then out on location, some 400 in number, to Ohlson. Each machine was covered by a separate lease, the terms of which were identical and are hereinafter referred to. Ohlson and Schennum, Becker, Severson, Engdahl and Blomberg formed a partnership known as the Bell Music Company, to operate the machines. Their partnership provided that after the payment of 35 per cent rental to appellant under Ohlson's leases, office expenses of the partnership, repairs and upkeep of the machines and the purchase of records, the net proceeds were to be divided among the several partners. This partnership rented offices separate from appellant and employed Miss Barran as bookkeeper and office girl, and also employed one Simmons to service machines in locations owned by colored people. The partnership had a bank account and a telephone listed in the name of Bell Music Company. The service partners, in making collections, made out slips, in duplicate, bearing the name, address, numbers of the ma-

chines, the amount collected and commission paid out, and the signature of the location owner.

Appellant, under the leases, could cancel any or all leases with Ohlson at any time. It exerted no control over the partnership. If any machine was not producing what it thought was a sufficient rental, it suggested to Ohlson that he either move the machine to another location or give adequate reasons why the particular machine or machines did not produce more income. During the existence of the leases appellant dealt solely with Ohlson. The partnership continued operation under the leases appellant had with Ohlson until about January 1, 1941, when appellant cancelled its leases with Ohlson and executed leases with Ohlson and his five partners in the same form as previously made to Ohlson.

The Director of Labor found that Barron and Simmons, employees of Bell Music Company, and Ohlson, Schennum, Becker, Severson, Engdahl and Blomberg, members of the partnership, were employees of appellant, and found appellant liable for an assessment and accrued interest amounting to $1272.28, after allowing a credit of $23.64 that had been paid by the Bell Music Company. The circuit court, upon review of the record under a writ of *certiorari*, found that the decision of the Director of Labor should be confirmed, the writ of *certiorari* quashed, and that appellant was indebted to the Director of Labor for contribution in the sum of $980.98 with interest at 1 per cent per month from the date the contributions became due and payable, and entered judgment against appellant in the sum of $1458.69.

Appellant contends that Ohlson, under his leases from October 1, 1938, to December 31, 1940, was operating and servicing the machines not as an employee but as an independent contractor, and that with his five partners, as the Bell Music Company, was operating an independent business, and that Miss Barran and Simmons were employees

of the Bell Music Company and not of appellant. To sustain the judgment, appellee insists that under the leases Ohlson was an employee of appellant; that the five servicemen, Barran and Simmons, were employees of Ohlson, to assist him in the work he was performing as an employee of appellant, and that under section 2(d) of the Unemployment Compensation Act, they must be also held to be employees of appellant, the employing unit.

The record, without contradiction, shows that appellant dealt solely with Ohlson in making the leases. It is admitted that the relationship of employer and employee existed between appellant and Barran and the six members of the partnership up to October 1, 1938. Appellant's vice-president testified that appellant desired to concentrate on the manufacture and sale of automatic phonographs and to avoid possibility of labor trouble, which might extend from service employees engaged in the operation of the machines to those of its factory, and its purpose was to retire from the business of operating the machines.

Appellee argues that notwithstanding this undisputed evidence the leases did not terminate the relationship of employer and employee. In construing contracts the language used therein, if not ambiguous, must be given the construction which the words used imply. (*Emerich Outfitting Co.* v. *Siegel, Cooper & Co.* 237 Ill. 610.) In other words, the language used must be given its common everyday meaning. Nothing can be added to nor taken from it to ascertain what the parties intended. The leases involved here each leased one automatic phonograph and equipment of records. Under the lease lessee was to install and maintain the leased property in a location where it would be accessible for use and operation by the public, but all arrangements for such purpose were to be made by lessee in his own name and behalf, and at his own expense and risk, without obligating lessor in any way. The lessee was to use his best efforts to keep the leased prop-

erty in operation in the best possible location so the largest possible earnings might be produced. Lessee was to pay lessor, as rentals, 35 per cent of the net amount taken in by the leased property after deducting the amount paid to location owners. All rentals were to be paid semimonthly, each payment to be accompanied by written statement signed by the lessee, on a form prescribed by the lessor, showing location of leased property, total taken in, and amount paid to location owner during the previous semimonthly period. Lessee, on termination of the lease, was to return the leased property in a like good working order as when received, reasonable wear and tear excepted. Lessee agreed to, at his own expense, (a) keep property in good repair, working order and condition; (b) replace damaged, worn-out, broken or out-of-date records, same to be the property of the lessor; (c) pay all taxes; (d) keep leased property insured and (e) provide for transportation, installation, operation and maintenance and protection of all leased property and make all collections therefrom. On failure of lessee to pay rentals or to keep or perform any agreement required by the lease to be kept, or in case of death or bankruptcy, lessor might elect to terminate without notice and repossess the leased property without process of law. The lease recited that it was understood and agreed that lessee was at all times to be an independent contractor and as such should carry on the business, so contemplated by the lease, in his own name and at his own expense and risk; that nothing in the lease should imply a partnership between lessor and lessee; that the payment of a per cent of the net amount taken in by the leased property was only a method of computing the amount of the rentals to be paid the lessor and gave no authority to obligate the lessor in any manner. This instrument does not purport to be other than what its language states, i.e., a lease of specific personal property. There is nothing in the language of the lease that can be

said even to imply that Ohlson was an employee of appellant. If he was, that relationship will have to be determined from applicable provisions of the statute.

Subparagraph (f)(1) of section 2 of the Unemployment Compensation Act, (Ill. Rev. Stat. 1937, chap. 48, par. 218,) as it existed prior to its amendment in 1939, defines "employment" as follows: "Subject to the other provisions of this subsection, 'employment' means service, including service in interstate commerce, performed for wages or under any contract of hire, written or oral, express or implied." As amended in 1939, the words "for wages or under any contract of hire, written or oral, express or implied" were eliminated and the words "by an individual for an employing unit, and including all services performed by an officer of a business corporation," were added.

The Unemployment Compensation Act was adopted to alleviate the stress of unemployment. In *Miller, Inc.* v. *Murphy,* 379 Ill. 524, it was held that the act, rather than the common-law concept of master and servant, governs that relationship. In *Rozran* v. *Durkin,* 381 Ill. 97, that holding was extended to the issue whether the services were those of an employee or contractor. In no case has this court held that where the service does not come within the definition of "employment" or "employing unit," as defined in the act, the one rendering that service becomes an employee. (*Ozark Minerals Co.* v. *Murphy,* 384 Ill. 94.) The act in no way destroys the relation of contractor or subcontractor.

In determining whether Ohlson was an employee or an independent contractor, the principal consideration, under the general rule pertaining to employer and employee, is the right to control the manner of doing the work. Not the actual exercise of the right by interfering with the work, but the right to control, constitutes the test. (*Ozark Minerals Co.* v. *Murphy,* 384 Ill. 94; *Amalgamated Roof-*

*ing Co.* v. *Travelers Ins. Co.* 300 Ill. 487.) "An independent contractor is one who undertakes to produce a given result without being in any way controlled as to the method by which he attains that result." (Jaggard on Torts, sec. 73.) A test often resorted to, in determining whether one is an employee or an independent contractor, is to ascertain whether the one doing the work represents the master as to the result of the work, only, or as to the means. If he represents the master only as to the result and himself selects the means, he must be regarded as an independent contractor. (*Ozark Minerals Co.* v. *Murphy,* 384 Ill. 94; *Pace* v. *Appanoose County,* 184 Iowa, 498, 168 N. W. 916.) The mere fact that the owner may have an overseer or an architect to see that the work complies with the contract or that the work is done to the owner's satisfaction, does not change the character of the contract, if it meets the test stated. *Ozark Minerals Co.* v. *Murphy,* 384 Ill. 94; *Pace* v. *Appanoose County,* 184 Iowa, 498, 168 N. W. 916; *Humpton* v. *Unterkircher,* 97 Iowa, 509, 66 N. W. 776; Thompson on Negligence, 2d, sec. 629.

Appellant, under the provisions of the leases, did not and could not exercise any control over the work of Ohlson other than as set out in the lease, which reserved to appellant only the right to call attention to certain locations where the receipts from the machine were not what appellant thought they should be, and in that event all appellant could do about it was to suggest the machine be placed in a new location or require that Ohlson satisfactorily explain why the receipts fell off. Appellant could cancel the lease on any one or more machines at any time Ohlson did not live up to the provisions of his lease. If and when that was done, their relationship as to the particular lease or leases was at an end.

Appellee urges that the 400 machines were on location under contracts between appellant and the owners of the places where the machines were placed; that appellant did

not assign its contracts to Ohlson, and the operation of the business continued as before the leases were executed. There is no evidence in the record, however, to show that appellant had .any contract or contracts with any person or persons relative to the placing of the machines. There was therefore no contract to assign. So far as the record shows, each and every machine was placed by Ohlson after the execution of the leases. There is no evidence in the record, nor can any implication be drawn from evidence that the leases were anything different from what they, on their face and according to their provisions, purported to be, and no evidence of any other relationship or control than that prescribed by the lease.

Prior to October 1, 1938, the placing of machines by appellant and the employment of Ohlson, his five servicemen and Barran to care for that branch of its business, was a separate and distinctive branch of the business of appellant. No effort was made to contradict appellant's evidence that it desired to discontinue that branch of its business and desired. also to devote its entire time to the manufacture and sale of its machines, and for this reason retired from that branch of its business. We see no difference in the arrangement appellant had with Ohlson from that of a farmer who owns a farm and machinery to operate it, and who also buys, sells and feeds livestock, and, desiring to devote his entire time to his livestock business and to be free from the responsibility of cultivating the land, leases to a then hired employee, his farm and his farm equipment and the use of the farm land, under a lease similar in its terms as to rentals, repairs and the like, to the one before us. Measured by the rules stated, and applying the facts as shown by the evidence, it is clear that Ohlson was not an employee of appellant but was an independent contractor.

In *Ozark Minerals Co.* v. *Murphy*, 384 Ill. 94, subparagraph (d) of section 2, defining "employing unit" and

"who shall be deemed to be an employee," was discussed, and it was there held that while it brings the employees of an independent contractor or subcontractor dealing with an "employing unit" within the act as employees of the "employing unit," with the exception therein specified, the act nowhere declares that an independent contractor, as defined by the statute, may be considered an employee of the employing unit.

That the General Assembly intended to tax employing units upon the wages of employees only and not on the earnings of independent contractors, is clearly shown by subparagraphs (f)(1) and (f)(5) of section 2 hereinabove referred to. By the amendment of section 2(f)(1) in 1939, (Ill. Rev. Stat. 1939, p. 1614,) "employment" means services by an individual for an employing unit. Under subsection (d) of section 2, the services of an independent contractor, as defined by the statute, are not included.

In the case before us there was no hiring of Ohlson, nor services to be performed for appellant by him. Under the leases Ohlson acquired the undisputed possession of the phonographs at a rental of 35 per cent of the net amount the machines produced. The services to be performed in the operation of the machines were not to be performed for the benefit of appellant, but were for the benefit of Ohlson, at his own expense. Like any other lease of property, when the lease expired by its terms or was cancelled, Ohlson was only to return each machine to appellant. Appellant was not an "employing unit" insofar as Ohlson was concerned. Neither section 2(f)(5), as in force in 1937, nor as amended in 1939, has therefore any application to the situation before us.

From what has herein been said it follows that the members of the partnership and their employees, Barran and Simmons, were not employees of appellant. The circuit court erred in quashing the writ of *certiorari* and in

entering judgment against appellant for the assessment and interest. The judgment is reversed and the cause remanded, with directions to quash the record.

*Reversed and remanded, with directions.*

Mr. JUSTICE THOMPSON, dissenting:

Under the interpretation and construction heretofore given the Unemployment Compensation Act, I am unable to agree with the majority opinion that the members of the partnership and their employees, Barran and Simmons, were not employees of appellant.

The opinion fails to emphasize the salient facts in connection with the written contract which, in my judgment, control this case. The words of the lease would not, alone, control, even though it could be called a lease.

In order to present my views both as to the law and the facts in this case, it will be necessary to make a rather extended analysis of the record. Prior to October, 1938, the appellant was engaged in the business of manufacturing automatic phonographs, many of which it placed with various business concerns in the city of Chicago, servicing these machines by its employees and agents, and by them collecting the proceeds. It is conceded by appellant, and so recognized in the majority opinion, that the relationship of employer and employee existed between appellant, Barran and the six members of the partnership up to October 1, 1938. The record also reveals that for some years prior to October 22, 1938, appellant was engaged in placing automatic phonographs in business places, under contracts with the proprietors, on a share-in-the-collection basis; that in connection with this business, it serviced the machines and attended to the collection of coins therefrom. The collections were divided between appellant and the proprietors, or owners, of the locations in which the machines were installed, in accordance with the contracts between them. It employed, for the purpose of servicing the machines and

making the collections therefrom, at least six employees, who are referred to as collector-servicemen.

On October 22, 1938, appellant entered into four hundred individual "leases" by which it leased the four hundred machines on locations to one H. N. Ohlson, a former salesman for appellant. Ohlson then entered into an agreement for the formation of a partnership under the style and firm name of Bell Music Company. In this partnership agreement Ohlson was designated as managing partner. Schennum, Becker, Severson, Engdahl and Blomberg were designated in the contract as service partners. Ohlson was to maintain the office for the transaction of the business and manage the office, to receive deposits and make disbursements of the collections made by the service partners, and other partnership funds, to keep books of account showing the receipt of all moneys turned in by the service partners, as collections from the machines, and to provide new records, as needed. In general, he was to supervise and direct the business.

Each of the four hundred leases provided that the lessee should install and maintain the leased property in locations in the city of Chicago where it was accessible for use and operation by the public, but that such arrangements for operation should be made by the lessee in his own name and behalf, and at his own expense and risk, without obligating the lessor in any way; that the lessee, at his own expense, agrees, during the continuance of the lease, (a) to keep the leased property in good repair, working order and condition; (b) to purchase from time to time, as needed, new records to replace records which may be damaged, worn out or out of date (all of such records so purchased to be the property of the lessor;) (c) to pay all taxes which may be assessed against the leased property; (d) to keep the leased property insured for the benefit of the lessor against loss or damage by fire or theft, in such companies and such amounts and form as may be approved

by the lessor; and (e) in general, to provide for the transportation, installation, operation, maintenance and protection of the leased property, and to make all collections therefrom; that in the event the lessee fails or neglects to keep and perform the agreement the lessor may, at its election, terminate the lease without notice and may repossess itself of the leased property without process of law. It was further provided by section 8 of the lease that the lessee shall at all times be an independent contractor and as such shall carry on his business of installing, maintaining and operating the leased property in his own name and behalf and at his own expense and risk, and that nothing in the lease should be construed as creating or implying any partnership relation between the lessor and the lessee; that the lessee is not an agent or representative of the lessor, and has no authority to obligate the lessor in any manner whatsoever.

It was immediately after this arrangement that Ohlson and five former employees of appellant entered into an agreement for the formation of a partnership styled "Bell Music Company." The service partners, under the leases, were required, after paying to the proprietors where the machines were located the per cent they were to receive by permitting the machines to be located on their premises, to turn the money over to the partnership. After payment of rentals by Ohlson to appellant, which was 35 per cent of the collections from the machines, the balance was then divided between the managing partner and the service partners. The partnership also employed Sophia Barran, who was formerly employed by appellant as office manager, clerk and bookkeeper, and later, a Mr. Simmons, who was employed to help stimulate the business in certain sections of the city. This arrangement continued until December, 1940, when the appellant, becoming dissatisfied, called Ohlson in and dissolved the leases with him and a few days later requested that the service partners, with

the exception of Severson, terminate their lease at California avenue, where they had been operating, and take space in its building so appellant might have better check on the operations of the business. The office was then returned to the building occupied by appellant and into a room leased from appellant. Miss Barran continued in charge of the office, the former service partners each taking leases on machines located upon the route which he had formerly been servicing. The operating and servicing the machines and collecting therefrom was handled from the new office in exactly the same manner as formerly handled, under leases containing the same provisions and terms as the former leases with Ohlson.

The majority opinion holds that Ohlson was not an employee of appellant but was an independent contractor. This, of course, must depend upon the relationship existing between Ohlson and appellant under the leases, and, in fact, as disclosed by the record. The term "independent contractor" is not mentioned or defined in the statute, although provisions therein exempt certain persons from the operation of the act as well as define an "employing unit." The statute specifically provides there must be an employing unit and that services must be performed by an individual for an employing unit. An "employing unit" is defined in section 2(d) and includes "any individual or type of organization * * * which has or subsequent to January 1, 1936, had in its employ one or more individuals performing services for it within this State." Further provision of the section is for the purpose of ascertaining the employing unit where contractors or subcontractors are performing services. Ill. Rev. Stat. 1943, chap. 48, par. 218.

In *New York Life Insurance Co.* v. *Murphy,* 388 Ill. 316, it was pointed out that section 2(d) was for the purpose of ascertaining the employing unit where contractors or subcontractors were engaged, and to make such

contractors or subcontractors liable as an employing unit two circumstances must occur: (1) that the contractor or subcontractor, at the time of his performing work for the employing unit, performs work, or is, in fact, actually available to perform work for anyone who may wish to contract with him; and, (2) is found to be engaged in an independently established trade, occupation, business or profession. Under such circumstances, the contractor or subcontractor becomes the employing unit. It is under this provision we determine who is the "employing unit." The contractor or subcontractor is the employing unit if the two conditions are present, otherwise the person receiving the benefit of such contract is the employing unit. This section is not the guide for determining whether individuals are rendering service but the purpose is to see that the person rendering service is never without an employing unit. The result is that the contractor-subcontractor provisions of section 2(d) can be applied only as between employing units and not as between employees. This presents the situation as to whether or not the so-called lease agreements and the facts as shown by the evidence made Ohlson a contractor or subcontractor and all others under him his employees. Under the terms of the lease and the facts as shown by the evidence he was not given such status. The words of the lease will not, alone, control even though it be called a lease. In the recent case of *Murphy* v. *Daumit,* 387 Ill. 406, where certain vacuum cleaner salesmen were called dealers, this court said: "This relationship must be determined from all of the actual facts in evidence. It would appear that the appellant here, through the designation of the individuals whose status is contested and the particular arrangement under which they were employed, was endeavoring to successfully by-pass the provisions of the Unemployment Compensation Act. It is necessary then to investigate the relationship by an examination of the incidents and circumstances surround-

ing the classification so that it may be determined what the relationship was in fact."

The contractor-subcontractor provisions of section 2(d) did not apply to Ohlson because he did not meet the requirements set forth therein and was therefore in "employment" for appellant. If the contractor-subcontractor, at the same time he performs work for the employing unit, performs work or is, in fact, actually available to perform work for anyone who may wish to contract with him and is found to be engaged in an independently established trade, business, profession or enterprise, he then becomes a contractor or subcontractor who is considered an employing unit. Ohlson did not meet the provisions of section 2(d) as to the contractor-subcontractor relation for the reason there can be no question that the work performed by Ohlson was a part of the usual business of appellant, whether such business be considered as operating directly or as operating through leasing. The record shows that Ohlson did not perform work for others at the same time he was performing work for appellant since he devoted his full time to the work, and that he was not actually available to perform work for others, since it was understood he was not to handle any other machines. He was not engaged in an independently established trade, business, profession or enterprise. As to being engaged in an independently established trade, business, profession or enterprise, I call attention to the case of *Murphy* v. *Daumit*, 387 Ill. 406, where this court said: "the act contemplates that one who is engaged in an independent enterprise is an individual who has a proprietary interest in such business to the extent that he can operate same without hindrance from any individual whatsoever and whose business also is free from control." It is apparent, both from the terms of the lease and from Ohlson's activities, he was not engaged in an independent enterprise. He did not come within the classification of a contractor or sub-

contractor, and under such circumstances the appellant receiving the benefits under the leases is the employing unit and being the employing unit all persons performing services for such unit are controlled by section 2(f) of the act. Any other interpretation would, in my judgment, do violence to the act both as to the language and the legislative intent.

The record discloses that Ohlson and the servicemen devoted their full time to the work of servicing appellant's machines and, as this court held in the *Daumit case,* their business was not free from control. The *New York Life Insurance Company case* is quite comparable where it was contended that solicitors or agents of an insurance company working under a contract were independent contractors and not in "employment." The court there held such agents were within the provisions of section 2(f) of the act. It is apparent the appellant is so controlled.

As the contractor-subcontractor provisions of section 2(d) did not apply to Ohlson because he did not meet the requirements set forth therein, the question then presents itself as to whether or not Ohlson is exempt under the provisions of section 2(f) of the Unemployment Compensation Act, as certain persons described in section 2(f)(5) (A, B and C,) are excepted, and while such persons would undoubtedly be independent contractors, yet a person who would constitute an independent contractor at common law may still be a person rendering service to an employing unit and be within the act, unless he is excepted by combination of all the elements of section 2(f)(5).

Section 2(f)(1) of the act, as originally enacted in 1937, provides: "Subject to the other provisions of this subsection, 'employment' means service, including service in interstate commerce, performed for wages or under any contract of hire, written or oral, express or implied." (Ill. Rev. Stat. 1937, chap. 48, par. 218.) As amended by the act approved May 24, 1939, section 2 (f)(1) defined

"employment" to mean services "performed by an individual for an employing unit, * * *." (Ill. Rev. Stat. 1939, chap. 48, par. 218.) Section 2(g) defined "wages" to mean, "every form of remuneration payable for personal services whether payable directly or indirectly, * * *." (Ill. Rev. Stat. 1939, chap. 48, par. 218.) The act of 1937 and the act as amended in 1939 are both applicable here, for the reason that the period covered by the assessment extended from October, 1938, to and including the third quarter of the year 1940.

It is provided in subsection 2(f)(5) of the Unemployment Compensation Act that services performed by an individual for wages shall be deemed to be employment subject to the act unless and until it is shown to the satisfaction of the Director that: "(A) Such individual has been and will continue to be free from control or direction over the performance of such services, both under his contract of service and in fact; and (B) Such service is either outside the usual course of the business for which such service is performed or that such service is performed outside of all the places of business of the enterprise for which such service is performed; and (C) Such individual is engaged in an independently established trade, occupation, profession or business." Ill. Rev. Stat. 1939, chap. 48, par. 218.

This court has many times held that the Unemployment Compensation Act does not depend upon any common-law concept of employer and employee. (*Smith* v. *Murphy,* 384 Ill. 34; *Rozran* v. *Durkin,* 381 Ill. 97; *Miller, Inc.* v. *Murphy,* 379 Ill. 524.) It is obvious that Ohlson was an employee and was not exempted under the provisions of subparagraph (A) of section 2(f)(5). He performed services under the leases and appellant took precautions that the machines were operated to its satisfaction. It was interested in the net collections and controlled the operation. It required a duplicate of the slips made

out by the collector, showing the amount taken from each machine and the amount paid to the proprietor of the location, signed by both the collector and by such proprietor.

The vice-president of appellant company testified that if, when he examined the collection slips sent in by the collector-servicemen, he found that certain locations were not bringing in proper rentals, he suggested to Ohlson that "he either move the machines or give sufficient reasons why they were not bringing in enough rental." He further testified that "At the end of 1940, December, in view of circumstances resulting in bad management as far as we could see, we called Ohlson and dissolved our lease with him, and starting in the neighborhood of January, 1941, we. requested that the men, Schennum, Ohlson, Becker, Blomberg, Miss Barran—Severson was out at that time—terminate their lease at California Avenue and take space in our building, so that we might have better check on the operation of the business, as far as our machines were concerned, and we made new leases with each of the individuals not recognizing the Bell Music Company."

It is apparent appellant was exercising control over the services rendered. Under the leases here involved Ohlson was not free from the control or direction of appellant in performing services under the leases. Appellant not only had the power to terminate the leases at any time, but in December, 1940, as above stated, did terminate the leases on account of the unsatisfactory services of Ohlson. As to this, Robert Gabel, vice-president of appellant company, testified, "We had no difficulty with Ohlson regarding rentals. We had difficulty with Ohlson because he did not pay attention to business. Ohlson was finally let out."

The second condition required by section 2(f)(5) is in. subparagraph (B). That subparagraph provides that in order to exempt an employee from the act, the service must be either outside the usual course of the business for which the service is performed or outside of all the places

of business of the enterprise for which such service is performed. It is clear that Ohlson did not come within this provision. The services rendered by Ohlson were operating and servicing the machines and making collections therefrom.

The third condition required is found in subparagraph (C) of section 2(f)(5). That subparagraph provides that before an individual is exempted from the act, it must appear that he is engaged in an independently established trade, occupation, profession or business. In *Peasley* v. *Murphy*, 381 Ill. 187, the employees were housewives who did work for the employer in their own homes. All of these women were at liberty to do work for persons other than the employer and, as a matter of fact, some of them actually did work for others. One of them had a sign in her window announcing "Dressmaking and Hemstitching." It was held that these women were not engaged in an independent trade or occupation. To the same effect is *Toplis and Harding, Inc.* v. *Murphy*, 384 Ill. 463. The record shows that Ohlson and the other men involved devoted their full time to the work of servicing appellant's machines. Ohlson did not come within the exception contained in subparagraph (C). Section 2(f)(5) provides that services by an individual shall be deemed employment, subject to the act, unless it is shown that he comes within all the exceptions contained in subparagraphs (A), (B), and (C) of that section. *Miller, Inc.* v. *Murphy*, 379 Ill. 524.

Appellant admits that the collector-servicemen associated with Ohlson and Sophia Barran, were engaged by Ohlson to assist him in the operation and servicing of the machines which he had undertaken to do under the leases. The last sentence of 2(d) of the act provides: "Each individual performing services for or assisting in performing the work of any person in the employment of an employing unit shall be deemed to be employed by such employing unit

for all the purposes of this Act, whether such individual was hired or paid directly by such employing unit or by such person, provided the employing unit had actual or constructive knowledge of the work."

The duplicate collection slips furnished to appellant, and the semi-monthly reports made through the office in which Sophia Barran was employed and kept the books and records, provided appellant with actual knowledge of the work being performed both by the collector-servicemen and Sophia Barran.

My observation is, there can be no question about a person having a right to lease his personal property for use by another and he has a right to place certain restrictions upon its use and, no doubt, incidental control, but when it goes beyond this by its leased terms and couples with it such service requirements as tend to make the leasing incidental to the service, the relationship would not be strictly one of lessor or lessee, where only incidental control is retained, and such services would fall within the terms of section 2(f) of the Unemployment Compensation Act. This court has repeatedly held this act should be given a liberal interpretation that the statutory definition of employment under the act extends coverage beyond the common-law concept of master and servant.

In my judgment the record does not justify the holding in the majority opinion that the services performed in the operation of the machines were not performed for the benefit of appellant but were for the benefit of Ohlson at his own expense and that the appellant was not an employing unit insofar as Ohlson was concerned. The opinion is in direct opposition to our holding that section 2(d), 2(f)(1) and 2(f)(5) should be given a meaning consistent and coextensive with the purpose of the act.

Mr. Justice Smith, also dissenting.